692 So.2d 641 (1997)
Sharon W. MAXWELL, et vir., Plaintiffs-Appellees,
v.
BOARD OF TRUSTEES FOR STATE COLLEGES & UNIVERSITIES, Defendant-Appellant.
No. 96-1207.
Court of Appeal of Louisiana, Third Circuit.
March 19, 1997.
Writ Denied June 13, 1997.
*642 Joe Payne Williams, Natchitoches, for Sharon M. Maxwell, et vir.
Henry M. Bernstein, Shreveport, for Board of Trustees for State Colleges & Universities
Before DECUIR, AMY and SULLIVAN, JJ.
AMY, Judge.
Plaintiff filed suit against the defendant alleging that she was injured after a fall caused by an allegedly hazardous condition on the campus of Northwestern State University. The trial court found in favor of the plaintiff. The defendant, Board of Trustees for State Colleges and Universities, now appeals. We reverse and enter judgment for the defendant.

DISCUSSION OF THE RECORD
This case arises from an accident which occurred on July 2, 1993 at Northwestern State University. The record reveals that the plaintiff, Sharon W. Maxwell, was employed as a teacher by the Rapides Parish School Board and was attending classes at the university in order to become certified in administration. The plaintiff indicated at trial that she had the career goal of becoming a school principal. On the date of the accident, the plaintiff had attended a class in the university's Teacher Education Building.
The plaintiff testified that she exited the building and proceeded to her vehicle to wait on two other students who had ridden with her to class. The plaintiff further testified that as she exited the building and proceeded down the outside stairs, she could not go straight to the parking lot because cars were parked immediately in front of the walkway *643 leading to the lot.[1] With regard to the accident that followed, the plaintiff testified:
I did not realize that I was off of the sidewalk until I lost my balance. And I stepped off, I guess, with.... I think it was with my right foot; then, I realized I had lost my balance and I was trying to keep my balance and not fall totally down. And I moved my books over to this arm and I remember the way I wound up was that I was holding onto the hood of the vehicle in front of me.
The plaintiff further testified that, following this accident, she "immediately felt a sharp pain," but thought for a week afterwards that she had "just pulled a muscle." She stated that she began to see a chiropractor because "it was just something that would be an adjustment...."
The record reflects that the plaintiff was able to finish the summer session of school she was attending at the university and begin the next session, but that the pain progressively worsened and she finally had to withdraw from school. She sought the help of Dr. Michael Buck, a family practitioner. Dr. Buck's report of the plaintiff's July 26, 1993 visit indicates that the plaintiff complained of "pain in the buttock area and into the back of the leg." The plaintiff testified that after a CAT scan was taken, she began receiving treatment from Dr. John Patton, a neurosurgeon. Dr. Patton testified by deposition that he reviewed the CAT scan taken by Dr. Buck and found that she had "an extruded disc fragment on the right side." He then stated that she was admitted to the hospital and that he performed surgery on the disc on August 19, 1993.
The plaintiff's testimony reflects that, following the surgery, she could no longer engage in the tasks she had once performed. She stated that she could no longer garden, care for her home, or cook as regularly as before. She also testified that she could no longer shop with her mother as she previously had and that her involvement in her church activities had decreased. Finally, the plaintiff testified that, after the surgery, she could not return to her teaching position as she had planned. She stated that following two semesters of sabbatical leave from her job, she applied for medical disability. She testified that she could not handle a classroom position and that she could not return to her job because she did not feel that she would be reliable.
The plaintiff filed suit against the defendant, the Board of Trustees for State Colleges and Universities, for the injuries she allegedly sustained as a result of the fall. The plaintiff alleged that the university was in the defendant's control, that the sidewalk in front of the Teacher Education Building "was defective due to the severe dropoff adjacent to the sidewalk and that it was unreasonably dangerous to normal use[,]" that the defendant had knowledge of the condition, and that the plaintiff was injured as a result of that condition. Along with the damages sought by the plaintiff, her husband, Gary Maxwell, sought damages for loss of consortium.
Following a February 1996 trial, the trial court found in favor of the plaintiff. In the reasons for ruling, the trial court found that the plaintiff's injury resulted from the condition of the area around the sidewalk where the accident occurred. In particular, the trial court found that marble chips had been removed from the area between the sidewalk and the curb creating the three to five inch change in elevation and "was in direct contravention of the plans and specification set out in the blueprints ..." for the building, and that the purpose of the chips had been to "prevent the exact kind of accident that befell Mrs. Maxwell." The trial court awarded the plaintiff a total of $999,942.54. The judgment reflects that $185,000.00 was awarded for general damages, $16,611.54 for medical expenses, $87,662.00 for lost wages through the date of trial, $361,978.00 for loss of earning capacity, and $290,494.00 for loss of future retirement benefits. In calculating *644 the plaintiff's lost wages, earning capacity, and retirement benefits, the trial court followed the plaintiff's expert who assumed that the plaintiff would have been promoted to principal and arrived at his estimate by considering a principal's salary. The trial court did, however, reduce the estimate slightly after finding that the plaintiff would probably have first served as an assistant principal for two years. Additionally, the trial court awarded $58,197.00 for loss of non-market household services which reimbursed the plaintiff for the help she obtained for tasks she could no longer perform. The trial court also awarded $35,000.00 to the plaintiff's husband for loss of consortium.
The defendants filed this appeal and assert the following as error: 1) The trial court erred in finding the defendant's premises unreasonably dangerous; and 2) The trial court erred in calculating the amount awarded for loss of wages from the date of injury through trial, loss of future earnings and earning capacity, and net loss of future retirement benefits.

LAW

Liability
The defendant does not dispute that the sidewalk area which caused the plaintiff's injury was within its custody nor that the accident caused the plaintiff's injury. The defendant instead argues that "[t]he central question is whether it was defective in the condition in which Sharon Maxwell encountered it and whether she was contributorily negligent in not watching where she was walking." The defendant maintains that the plaintiff had repeatedly walked past the sidewalk area, that the edge of the sidewalk was clearly distinguishable, and that the plaintiff was walking at an angle and off the sidewalk when she stumbled from the sidewalk. The defendant also maintains that there was no testimony that a 3-5 inch drop-off existed at the time of the accident, but only that a drop-off existed several months later by which time the area could have eroded.
The trial court did not distinguish, in reasons for ruling, between whether the plaintiff prevailed under a negligence or strict liability theory of recovery. However, such a distinction is unnecessary for the present review as these theories are analyzed by the courts in a similar manner. See Oster v. DOTD, 582 So.2d 1285 (La.1991). In order to recover under either theory, the plaintiff must prove: 1) the thing causing the damage was in the custody of the defendant; 2) the thing contained a defect that created an unreasonable risk of harm to the plaintiff; and 3) this defective condition caused the plaintiff's injuries. Oster, 582 So.2d 1285 (citing Sistler v. Liberty Mutual Ins. Co., 558 So.2d 1106 (La.1990)). One difference between the two theories of recovery is that, under a strict liability theory of recovery, the plaintiff need not prove that the defendant had notice of the defect. Id. However, if the strict liability suit is brought against a public entity, as is the defendant in the present case, a plaintiff must prove that "the public entity had actual or constructive notice of the particular vice or defect which caused the damage prior to the occurrence, and the public entity has had a reasonable opportunity to remedy the defect and has failed to do so." La.R.S. 9:2800.
As stated by the supreme court in Oster:

Under the negligence theory, it is the defendant's awareness of the dangerous condition of the property that gives rise to a duty to act. Under a strict liability theory, it is the defendant's legal relationship with the property containing a defect that gives rise to the duty. Loescher v. Parr, 324 So.2d 441, 446 (La.1976). Under both theories, the absence of an unreasonably dangerous condition of the thing implies the absence of a duty on the part of the defendant.
Id. at 1288.
Accordingly, in order to determine whether the defendant owed the plaintiff a duty to protect her from falling as she walked off of the sidewalk, this court must determine whether the area adjacent to the sidewalk involved in the present case constituted an unreasonable risk of harm. The supreme court has stated that:
The unreasonable risk of harm criterion entails a myriad of considerations and cannot *645 be applied mechanically. As we stated in Landry v. State of Louisiana and the Board of Levee Commissioners of the Orleans Levee District, 495 So.2d 1284 (La. 1986):
"the unreasonable risk of harm criterion... is not a simple rule of law which may be applied mechanically to the facts of a case. It is a concept employed by this court to symbolize the judicial process required by the civil code. Since Articles 2317 and 2322 are not detailed rules for all concrete cases, it becomes the interpreter's duty to decide which risks are encompassed by the codal obligations from the standpoint of justice and social utility." 558 So.2d at 1112. Reaching an intelligent and responsible decision of whether a risk is unreasonable involves consideration of moral, social, and economic values as well as the ideal of justice.
Id. at 1287 (quoting Entrevia v. Hood, 427 So.2d 1146 (La.1983)). Although courts, including this court, have described the unreasonable risk of harm criterion as requiring the court to balance the likelihood and magnitude of harm against the utility of the thing, the balancing test required by the unreasonable risk of harm criterion does not lend itself well to such neat, mathematical formulations. In addition to the likelihood and magnitude of the risk and the utility of the thing, the interpreter should consider a broad range of social, economic, and moral factors including the cost to the defendant of avoiding the risk and the social utility of the plaintiff's conduct at the time of the accident.
In essence, the unreasonable risk of harm analysis is similar to the duty-risk analysis which is performed in a negligence case. The obligation placed by article 2317 upon a landowner to maintain his land free from defects does not encompass every injury that happens to occur on his land. See Socorro v. City of New Orleans, 579 So.2d 931 (La.1991) (because an owner cannot be held responsible for all injuries resulting from any risk, the court's duty is to decide which risks are unreasonable). Just as in a negligence analysis, a court utilizing an article 2317 strict liability analysis must determine whether the codal duty imposed upon a custodian of the thing was placed upon him to prevent the type of accident involved in the case before the court. Landry v. State of Louisiana and the Board of Levee Commissioners of the Orleans Levee District, supra; Entrevia v. Hood, supra, (Lemmon, J., concurring). The court must carefully consider all the circumstances surrounding the particular accident under review to determine whether allowing recovery to the particular plaintiff involved, for damages occurring in the particular manner in which the plaintiff was injured, is desirable from the standpoint of justice and the social utility of the conduct of the respective parties.
Oster, 582 So.2d at 1288-89 (footnote omitted).
Additionally, the supreme court has recently reaffirmed that an unreasonable risk of harm analysis should be made in light of moral, economic, and social considerations. Boyle v. Board of Supervisors, 96-1158 (La.1/14/97); 685 So.2d 1080. This risk-utility balancing test followed by the court in Boyle is adopted from the court's earlier decision in Entrevia v. Hood, 427 So.2d 1146 (La.1983), and includes the weighing of "factors such as gravity and risk of harm, individual and societal rights and obligations, and the social utility involved." Boyle, 96-1158 at p. 5; 685 So.2d at 1083.
Finally, a trial court's finding of whether a condition presents an unreasonable risk of harm is a factual determination which will not be reversed absent manifest error. Tullis v. Rapides Parish Police Jury, 95-905 (La.App. 3 Cir. 1/17/96); 670 So.2d 245, writ not considered, 96-0444 (La.3/29/96); 670 So.2d 1241. See Hataway v. Jeep Corp., 96-166 (La.App. 3 Cir. 8/14/96); 679 So.2d 913, writ denied, 96-2281 (La.12/6/96); 684 So.2d 926.
In Boyle, the plaintiff was injured in a slip and fall accident allegedly caused by a defect in a sidewalk at Louisiana State University. A safety engineer, presented as an expert, testified that he measured the depression as ranging from one-half to one inch and that he considered any depression beyond *646 one-half an inch to be a tripping hazard. Additionally, a civil engineer, estimated the depression as one inch to one and one-eighth of an inch. He also testified that he considered a depression of over one-half an inch to be a hazard. The trial court relied on these opinions and found that the condition of the sidewalk was defective. The supreme court found that "[t]he finding of the existence of a defect alone is not a sufficient analysis to establish liability." Boyle, 96-1158 at p. 5; 685 So.2d at 1083.
After noting that the lower court did not discuss whether an unreasonable risk of harm was created by the defect, the supreme court then went on to apply the risk-utility balancing test discussed in Entrevia. In particular, the court found that while the gravity of harm was great as the plaintiff sustained serious injuries, the risk of injury was low as, there were no previously reported accidents at that location despite heavy traffic. The court also considered the utility of sidewalks on a university campus and the expense that would be incurred in the maintenance of the university's sidewalks. After considering these factors, the supreme court concluded that no unreasonable risk of harm was created.
We first recognize that the trial court in the instant matter was presented with impressive evidence of the area's original design and opinion regarding the safety of the sidewalk, the depression, and the curb area. For example, the architect who originally designed the Teacher Education Building and its grounds, Harold L. Dekeyzer, testified by deposition that he had designed the area to be filled with marble chips or white stones. He stated that the design was created to eliminate the difference in elevation between the sidewalk and curb. Dekeyzer further stated that this design allowed for drainage and alerted pedestrians that there was a change in the slope of the ground surface. He also testified that he recommended marble chips as the fill material to further alert pedestrians to the change in slope and for aesthetic reasons as well. He affirmed that the condition would be a hazard without the material and that, as an architect, he would not have accepted it as a finished product.
Additionally, the plaintiff presented Leonard Charles Quick, a civil engineer, who testified that on February 23, 1994, several months after the accident, the depressed area varied from two and one-half to three and one-eighth inches. He further testified that, at the time of trial in February 1996, the depression had changed and was three and one-half to four and one-fourth inches. Quick stated that the Southern Building Code required that "any direct vertical change in elevation must be limited to one-quarter of an inch or less." He also testified that if the fill material had been present, as was called for in the original design, the code would not have been violated. Like, Dekeyzer, Quick affirmed that the removal of the fill material and creation of a three to five inch drop would create a hazard.
Loren Lindsay, the director of the physical plant, affirmed that the blueprints for the construction of the building called for the area between the sidewalk and curb to be filled with stone. He stated that he could not recall if marble chips had ever been used as fill material or whether that material had been removed at some point. He also testified that the drop-off or depression at the edge of the sidewalk was approximately three inches, but could vary between three and five inches along the length of the sidewalk.
We observe that the record is devoid of proof as to the depth of the difference in height between the sidewalk and the adjacent ground on the day of the accident. Nor, after reviewing the record, does it provide certainty as to the exact location at which the plaintiff stepped off the sidewalk and the accident occurred.
Nevertheless, we acknowledge that when faced with this expert testimony that the trial court's determination that the nature of the area caused the accident is not manifestly erroneous; however, the analysis must also include consideration of the risk-utility test followed by the supreme court in Boyle and Entrevia. The injury involved in the present case was indeed severe, but the test to be employed is the risk of harm in general. See *647 Boyle, 96-1158; 685 So.2d 1080. After thorough review, we do not find that this condition presents a risk of harm greater than any risk one may reasonably expect to encounter when walking across a college campus; i.e., it does not present an unreasonable risk of harm. In the present case, the plaintiff did not fall off of the edge of the sidewalk, but merely stumbled. Further, we find that the condition in the instant matter presents less risk of harm than a depression or crack in the sidewalk, as the sidewalk is designed to be walked along, whereas, in the present case, the difference in surface height was not in the sidewalk, but alongside the sidewalk in an area not designated for pedestrian use.
Additionally, the risk of harm is lessened in the present case as a walkway connects the sidewalk and parking lot in one area. A pedestrian has been given a safer and more natural pathway to use rather than forcing the pedestrian to cut across the depressed area.
Finally, we find from the photographs entered into evidence that the condition was obvious, thereby reducing the risk of harm. The photographs indicate that, although the depressed area is uneven and partially covered with grass, it is clear that there is a drop-off at the edge of the sidewalk.
We must also consider the utility of the sidewalk and the curb area. While this is not strictly a sidewalk case, we are mindful that neither the condition nor any risk involved would exist without the sidewalk. The supreme court has acknowledged that sidewalks enjoy a high societal utility. Boyle, 96-1158; 685 So.2d 1080. See also Morell v. City of Breaux Bridge, 94-1378 (La.App. 3 Cir. 5/31/95); 660 So.2d 882, writ denied, 95-2608 (La.1/12/96); 666 So.2d 321. Accordingly, we adopt this finding for our review of the instant matter and weigh it, along with other factors, to determine whether an unreasonably dangerous condition is present in this case. This consideration militates against such a conclusion.
Last, we must consider the possible costs of a finding of liability on the part of the defendant. While the defendant presented no evidence of the expense of corrective measures, the ultimate cost of a finding of liability would arise every time a pedestrian stumbled or tripped off the edge of a sidewalk or curb on the campus. We decline to affirm a ruling that would place such a stringent standard on the university. We do not find, however, that no drop-off from a sidewalk can present an unreasonable risk of harm, but only that there is none in the present case.
Accordingly, we find that the trial court was manifestly erroneous in finding that the area surrounding the sidewalk presented an unreasonable risk of harm.

Damages
As we find that the trial court was manifestly erroneous in finding an unreasonable risk of harm, we need not address the defendant's second assignment.

DECREE
For the foregoing reason, we conclude that the district court erred in finding that the condition on the campus of Northwestern State University posed an unreasonable risk of harm. The decision of the lower court is reversed. It is hereby ordered, adjudged, and decreed that judgment is rendered in favor of the defendant, Board of Trustees for State Colleges and Universities, dismissing plaintiffs', Sharon W. Maxwell and Gary Maxwell, demands against it. All costs are assessed against the plaintiffs.
REVERSED AND RENDERED.
*648 
NOTES
[1] Photographs entered into evidence indicate that between the curb to the parking lot and the sidewalk across which the plaintiff was walking, there was a lower area covered by dirt and grass. We have studied the numerous photographs of this area which plaintiffs' offered into evidence, and attached two which appear to have been taken at different times. (See attached photographs.)